## TEXAS & NEW ORLEANS RAILWAY COMPANY V. COUNTY OF GALVESTON.

No. 8005. Decided March 10, 1943.
Rehearing overruled April 14, 1943.
(169 S. W., 2d Series, 713.)

*Baker, Botts, Andrews & Wharton, Armstrong, Cranford, Barker & Bedford,* and *W. E. Cranford,* all of Galveston, for petitioner.

It was error for the courts to hold that the indemnity provisions of the contract constituted a lending of the county's aid and credit to the railroads and violated the provisions of section 52 of Article 3 of the Constitution. And that said contract created a debt, within the meaning of section 7 of Article 11 of the Constitution, without making provision for its payment. Imperial Irr. Co. v. Jayne, 104 Texas 395, 138 S. W. 575; Weaver v. Scurry County, 28 S. W. 636; Bexar County v. Linden, 110 Texas 339, 220 S. W. 761.

*Charles H. Theobald,* County Attorney, and *Emmett F. Magee,* Assistant County Attorney, both of Galveston, for respondent.

As the provisions of this contract are in direct conflict with the Constitution the court did not error in rendering judgment in favor of Galveston county. Stevenson v. Blake, 131 Texas 103,

113 S. W. (2d) 525; City of Cleburne v. Gutta Percha & Rubber Mfg. Co., 127 S. W. 1072; 30 Tex. Jur. 439.

MR. JUDGE BREWSTER delivered the opinion of the Commission of Appeals, Section A.

In 1908, Galveston County, three railway companies and an interurban company made a contract for the construction of a causeway and a drawbridge to connect Galveston Island with the mainland. The structure was to be occupied by a public road of the county and by the tracks of the railway and interurban companies. The county was to do the work under the direction of an engineer selected by the other parties, with the advice and consent of the county. Up to a cost of $1,400,000, the railway companies were to pay a half and the interurban company and the county each a fourth. Beyond that, the cost was to be borne by the county, which was to have the title, but the other parties and their assignees were to enjoy a lease for 999 years on that part of the causeway not used by the county's highway. The portion to be used by each party was specified in the contract.

About the middle of the causeway was the drawbridge, across which ran the county's highway and the tracks of the railway interurban companies. It was pivoted on the mainland side of the causeway, and could be lifted to permit seagoing vessels to navigate the channel, which otherwise was blocked by the causeway. When the drawbridge was up, the causeway from Galveston Island had an unobstructed opening into the channel.

Under the terms of the contract, the railway companies were to maintain, repair and operate the drawbridge and the cost was to be prorated among them, the interurban company and the county. It was agreed that "the officers, agents and employees of the steam railway companies * * engaged in the work of * * operating the draw-bridge as provided in paragraph (e) hereof, shall be deemed and treated as joint employees of the parties to this agreement." Then came the provision which is the subject matter of this suit. It was that *neither the railway companies nor the interurban company "shall be liable for any injury to person or damage to property which shall occur in connection with the use or attempted use of the drawbridge, or in the draw space, when the draw-bridge may be open, when the person injured or the property damaged shall be in the course of travel or transportation over the county road, and the county will indemnify and save harmless each of the other parties hereto from any such liability."* (Italics ours.)

By special act of the Legislature, passed in 1909, the contract, quoted in its entirety, was expressly ratified, approved and confirmed, the emergency clause reciting that "the public interests require the immediate construction of the causeway across Galveston Bay in Galveston County." S. B. No. 187, Special & Local Laws, Regular Session, 31st Leg., p. 589.

Shortly after midnight, March 7, 1936, three men were traveling the public road on the causeway in an automobile going from the island to the mainland. The drawbridge was open, and the car plunged off the causeway into the waters of Galveston Bay, killing two of the men and seriously injuring the third. Identical suits were thereafter filed by the injured man and the next of kin of the dead men against the Texas and New Orleans Railroad Company, assignee of one of the three railway companies which executed the foregoing contract, based on allegations that the defendant was operating the drawbridge when the tragedy occurred, had raised it just before the three men reached it and had negligently failed, in several particulars, to give them any warning that it was then open.

The railway companies contended that the liabilities asserted in the three suits were covered by the indemnity clause above quoted. Claiming that the provision was unconstitutional, Galveston County declined to defend the suits. The injured man's case was tried and judgment was rendered for the railway company. After the county and the railway company had made a written agreement, in which each reserved the right to sue the other for the amount paid by it, the two death cases were compromised before trial for $5,000.00, the county paying $1,250.00 and the railway company $3,750.00.

The case at bar is a suit by the railway company against the county to recover $5,302.59, being the $3,750.00 paid to settle the death claims plus expenses and attorneys fees incurred in defending the three suits. The trial court held that the indemnity provision was void because it violated Art. 3, Sec. 52, of the Constitution of Texas, and rendered judgment for the county, which was affirmed by the Court of Civil Appeals at Galveston. 161 S. W. (2d) 530. The latter court held that the clause was a lending of the credit of the county to a corporation, in violation of said Art. 3, Sec. 52, supra, and that it created a debt against the county without proper provision for payment, in violation of Art. 11, Sec. 7, ibid. Two points of error complain here of that ruling.

Art. 11, Sec. 7, supra, reads, in part, as follows: "No debt for any purpose shall ever be incurred in any manner by any city or county unless provision is made at the time of creating the same, for levying and collecting a sufficient tax to pay the interest thereon and provide at least two per cent as a sinking fund."

■ Public policy demands that definite limitations be placed on the power of the several political subdivisions of our government to spend public money. As to counties, the limitation is to pay cash, that is, to pay out of current revenues or from funds within the immediate control of the county. Debt, with a provision at the time it is incurred to pay interest and at least two per cent of the principal each year, is the only alternative. If this provision is not made, the "debt" is a nullity. This is the requirement of Art. 11, Sec. 7, supra. Its language is unequivocal. It voices the public policy demand so clearly that no arm or agency of government should attempt to deny it.

■ The Supreme Court has said that the word *debt*, as used in the Constitution, means any pecuniary obligation imposed by contract, except such as was, at the time of the agreement, within the *lawful* and *reasonable* contemplation of the parties, to be satisfied out of the current revenues for the year or out of some fund then within the immediate control of the county. In other words, if the obligation does not arise as an item of ordinary expenditure in the daily functioning of the county government or if it is not to be paid out of funds then in the county treasury legally applicable thereto, it is a debt and falls under the condemnation of the Constitution, unless the required provision for its payment is made at the time the obligation is incurred. McNeal v. City of Waco, 89 Texas 83, 33 S. W., 322; Stevenson v. Blake, 131 Texas, 103, 113 S. W. (2d) 525.

■ Manifestly, the parties making the contract could not then determine either when the county would become obligated under the clause in controversy or the extent of any such obligation. So far as they could foresee, it might accrue in a few days or not until after the lapse of centuries; it might amount to a few dollars or to many thousands. Although the obligation did not come for 28 years and amounted to only $5,302.59, a sum which may well have been within the ability of Galveston County to pay out of current revenues for the year 1936 or from some fund then within the immediate control of the county, certainly nobody would seriously affirm that such fact was reasonably within the contemplation of the parties when they made the

contract. They simply could not know when the operators of the drawbridge would become negligent or how many travelers on the causeway would suffer therefrom or what the financial condition of the county would then be. Therefore, the parties could not contemplate, from any reasonable standpoint, that the indemnity clause would not some time fix a debt on the county in violation of the Constitution. In this connection, another provision of the contract is significant. It is that any amount which may become due by one party to another party shall bear interest at 6 per cent per annum until paid, if not paid within sixty days after written demand therefor. This clearly includes any demand that might arise against the county under, the indemnity clause. In language as plain as can be used, it says that any such indemnity demand, unsatisfied for sixty days, shall become an interest-bearing debt, yet there is not even a suggestion of any provision to pay the accrued interest and two per cent of the principal each year.

Thus, by the terms of the indemnity clause, there was attempted to be created for Galveston County for more than thirty generations a continuing hazard that its taxpayers might be confronted with an obligation growing out of the negligent operation of the drawbridge which they could not pay out of current funds or out of funds then within their immediate control. We think the indefiniteness of the clause as to what obligation may arise thereunder renders it more vicious, from the standpoint of public policy, than if it had named a sum of money to be paid at a given time but clearly beyond the power of the county to pay out of available funds. Surely the size of an obligation is a controlling factor to be considered in measuring ability to pay.

We realize that the contract is reciprocal with respect both to the burdens assumed and the benefits enjoyed by its several parties, but that fact cannot save a clause thereof which is contrary to fundamental law as declared in the Constitution. In the face of that declaration, even the approval of the Legislature avails nothing. The parties to the contract are presumed to have known this.

We hold the clause under consideration is void because it violates Art. XI, Sec. 7, of the Constitution of Texas. It is unnecessary for us to consider whether it violates other provisions thereof.

The judgments of the courts below are affirmed.

Opinion adopted by the Supreme Court March 10, 1943.

Rehearing overruled April 14, 1943.